UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-CR-80182-ROSENBERG/REINHART

UNITED STATES OF AMERICA

vs.

VICTORIA YVONNE WILLIAMS
a/k/a "Vee,"

Defendant.
_____/

## PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office") and Victoria Yvonne Williams (hereinafter referred to as the "defendant") enter into the following agreement:

1. The defendant agrees to plead guilty to Counts One, Five, Six, Seven and Eight of the Indictment. Count One of the Indictment charges the defendant with conspiracy to possess with the intent to distribute five hundred (500) grams or more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Counts Five, Six, Seven, and Eight of the Indictment charge the defendant with distribution of five hundred (500) grams or more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii). The defendant agrees that she is, in fact, guilty of the offenses.

2. This Office agrees to seek dismissal of Counts Two, Three, and Four of the Indictment, as to this defendant, after sentencing.

3. The defendant is aware that the sentence will be imposed by the Court after considering

1

the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4. The defendant also understands and acknowledges that as to each of Counts One, Five, Six, Seven, and Eight of the Indictment the Court must impose a minimum term of imprisonment of ten (10) years and may impose a statutory maximum term of imprisonment of up to life, followed by a minimum term of supervised release of five (5) years up to life. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $10,000,000 and may order forfeiture and restitution.

5. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 4 of this agreement, a special assessment in the amount of $100.00 will

2

be imposed on the defendant as to each Count. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If a defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

6. This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

7. Although not binding on the probation office or the Court, the parties will jointly request that the Court make the following findings with regard to the defendant's relevant conduct: the amount of a mixture and substance containing methamphetamine, methamphetamine (actual) and cocaine base for which the defendant is responsible at least 90,000 KG of Converted Drug Weight.

8. This Office agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, this Office will file a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate

their resources efficiently. This Office, however, will not be required to make this motion and this recommendation if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

9. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, this Office, or the probation office, is a prediction, not a promise, and is not binding on this Office, the probation office or the Court. The defendant understands further that any recommendation that this Office makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by defendant, this Office, or a recommendation made jointly by the defendant and this Office.

10. The defendant agrees, in an individual and any other capacity, to forfeit to the United States, voluntarily and immediately, any right, title, and interest to any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of a violation of 21 U.S.C. § 841 as alleged in the Indictment and any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation, pursuant to 21 U.S.C. § 853.

11. The defendant further agrees that forfeiture is independent of any assessment, fine, cost, restitution, or penalty that may be imposed by the Court. The defendant knowingly and voluntarily agrees to waive all constitutional, legal, and equitable defenses to the forfeiture, including excessive fines under the Eighth Amendment to the United States Constitution. In addition, the defendant agrees to waive: any applicable time limits for administrative or judicial forfeiture proceedings, the requirements of Fed. R. Crim. P. 32.2 and 43(a), and any appeal of the forfeiture.

12. The defendant also agrees to fully and truthfully disclose the existence, nature and location of all assets in which the defendant has or had any direct or indirect financial interest or control, and any assets involved in the offense of conviction. The defendant agrees to take all steps requested by the United States for the recovery and forfeiture of all assets identified by the United States as subject to forfeiture. This includes, but is not limited to, the timely delivery upon request of all necessary and appropriate documentation to deliver good and marketable title, consenting to all orders of forfeiture, and not contesting or impeding in any way with any criminal, civil or administrative forfeiture proceeding concerning the forfeiture.

13. This is the entire agreement and understanding between this Office and the defendant. There are no other agreements, promises, representations, or understandings.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

6/21/24
DATE

By: _____
BRIAN D. RALSTON
ASSISTANT UNITED STATES ATTORNEY

6/20/24
DATE

By: _____
JEFFREY H. GARLAND
COUNSEL FOR DEFENDANT

6/20/24
DATE

By: _____
VICTORIA YVONNE WILLIAMS
DEFENDANT

5

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-80182-ROSENBERG/REINHART

UNITED STATES OF AMERICA

vs.

VICTORIA YVONNE WILLIAMS,
    a/k/a "Vee,"

    Defendant.
_____/

## FACTUAL BASIS IN SUPPORT OF GUILTY PLEA

The United States of America and Victoria Yvonne Williams, (hereinafter "Defendant") agree that had this case proceeded to trial, the United States would have proven the following elements and facts beyond a reasonable doubt as to Count One of the Indictment charging the defendant with Conspiracy to Possess with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, and 841(b)(1)(A)(viii), and Counts Five, Six, Seven, and Eight of the Indictment charging the defendant with Distribution of a Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii).

### Elements

#### Count 1: Conspiracy to Possess with Intent to Distribute a Controlled Substance

**First:**     The Defendant and others agreed to accomplish a shared and unlawful plan to possess a mixture and substance containing a detectable amount of methamphetamine;

**Second:**     That the Defendant, knowing the unlawful purpose of the plan, willfully joined in it; and

**Third:**     That the object of the unlawful plan was to possess with intent to distribute a controlled substance, specifically, five hundred (500) grams or more of a mixture and substance containing a detectable amount of methamphetamine.

### Counts 5, 6, 7, and 8: Distribution of a Controlled Substance

**First**: The Defendant knowingly and intentionally distributed a controlled substance;

**Second**: That the controlled substance was a mixture and substance containing a detectable amount of methamphetamine; and

**Third**: That the weight of the mixture and substance containing a detectable amount of methamphetamine was five hundred (500) grams or more.

### Background

1. In April 2022, the DEA began investigating the distribution of crystal methamphetamine by a retail dealer operating in West Palm Beach, Florida. The investigation progressed and in or around July 2022, the DEA identified the defendant as distributing crystal methamphetamine to the retail dealer's suppliers. Over the course of the next several months, law enforcement conducted several controlled purchases of crystal methamphetamine from the defendant.

### Controlled Purchases of Crystal Methamphetamine from the Defendant

2. On August 30, 2022, a law enforcement officer acting in an undercover capacity ("UC") contacted the defendant to purchase $3,600 worth of crystal methamphetamine. The following day, the UC and the defendant agreed to meet at the Dunkin Donuts on Sunrise Blvd in Fort Lauderdale, Florida. The UC arrived at the Dunkin Donuts; however, the defendant was not there, and agents observed her near her residence at 2864 NW 6th Court, Fort Lauderdale, Florida. At the Dunkin Donuts, the UC made contact with co-defendant Lionel Bain ("Bain"). The UC asked Bain if he was there on behalf of the defendant and Bain confirmed that he was. Shortly thereafter, the UC provided $3,600 to Bain in exchange for crystal methamphetamine. DEA Laboratory results confirmed the substance to be methamphetamine and had a net weight of 448 grams with 93% purity.

3. At the conclusion of the crystal methamphetamine transaction described above, the UC told Bain that he had additional cash to purchase more methamphetamine. The UC and Bain agreed

that the UC needed to call the defendant. The UC contacted the defendant regarding the purchase of additional crystal methamphetamine and the defendant told the UC to wait at Dunkin Donuts. Bain departed the Dunkin Donuts and agents who were conducting physical surveillance observed Bain at 2864 NW 6th Court, Fort Lauderdale, Florida. While outside the residence, the defendant handed Bain a red shoebox. The defendant and Bain then drove to the Dunkin Donuts in separate vehicles. At the Dunkin Donuts, Bain entered the UC's vehicle and handed the red shoebox to the UC. Meanwhile, the defendant was in the drive thru of the Dunkin Donuts. Upon exiting the UC's vehicle, Bain walked to the defendant's vehicle and handed her the money from the transaction with the UC. DEA Laboratory results confirmed the substance to be methamphetamine and had a net weight of 195 grams with 88% purity.

4. On October 13, 2022, the UC contacted the defendant regarding the purchase of two pounds of crystal methamphetamine. The next morning the defendant and the UC exchanged several phone calls to coordinate the transaction. Agents established surveillance at the defendant's residence and 2857 NW 6th Court Fort Lauderdale, Florida. Based on the conversation between the UC and the defendant, agents understood that the defendant was not in the area and was coordinating the transaction through a third party. The defendant eventually instructed the UC to travel to the Dunkin Donuts on Sunrise Boulevard, Fort Lauderdale, Florida. At around the same time, agents observed co-defendant John Morgan Williams ("J.Williams") depart the area of 2857 NW 6th Court while carrying a bag and enter a Volkswagen Jetta. A short time later, J.Williams arrived at the Dunkin Donuts. He then walked to the UC's vehicle with the bag. The UC then exchanged cash for the crystal methamphetamine. J.Williams exited the UC's vehicle, returned the Jetta, and was later observed entering 2857 NW 6th Court. The crystal methamphetamine purchased from the defendants was tested by the DEA Southeast Laboratory and confirmed to be methamphetamine with a net weight of 1129 grams and approximately 91% purity.

5. On November 6, 2022, the UC contacted the defendant to purchase $5,600 worth of crystal methamphetamine. On November 7, 2022, the UC and the defendant finalized a location to meet, and the defendant directed the UC to the Dunkin Donuts on Sunrise Boulevard, Fort Lauderdale, Florida. Agents established surveillance at the defendant's residence and observed her depart the residence and travel to the Dunkin Donuts. Upon arrival at the Dunkin Donuts, the defendant contacted the UC and told him that she was going inside the restaurant. The defendant entered the restaurant, returned to her vehicle, and then walked to the UC's vehicle where she placed a Dunkin Donuts box in the front passenger seat. The UC opened the box and observed two Ziploc bags containing meth. The UC then provided the defendant with $5,600. DEA Laboratory results determined that the methamphetamine had a net weight of 891 grams with 100% purity.

6. On December 7, 2022, the UC contacted the defendant to purchase three pounds of crystal methamphetamine. On December 8, 2022, the UC received an incoming text from the defendant asking if he was on his way to the Dunkin Donuts where they had previously conducted a methamphetamine transaction. The UC asked if the defendant could bring the crystal methamphetamine to the West Boca Medical Center in Boca Raton, Florida. The defendant responded that she could, but it would take about an hour. Agents thereafter established surveillance at 2864 NW 6th Court. Prior to the defendant's arrival, agents observed J.Williams and Bain in the driveway of the residence. As the defendant arrived, J.Williams picked up a bag containing a carton box from the ground on the driveway and handed it to Bain. Bain opened the defendant's front passenger door and placed it on the seat. The defendant departed the area and travelled to the West Boca Medical Center. Upon her arrival, the UC walked to her vehicle and opened the front passenger door. The UC observed a bag on the floorboard that contained a carton box. The defendant opened the carton box, which contained a heat-sealed bag with three pounds of crystal methamphetamine. The UC then provided the defendant with $8,400 and returned to his

vehicle. DEA Southwest Laboratory results confirmed the substance purchased from the defendants to be methamphetamine and had a net weight of 1332 grams with approximately 99% purity.

7. On January 26, 2022, the UC contacted the defendant to purchase one and half pounds of meth. The defendant and the UC agreed to meet at the Wawa gas station on Powerline Road, Fort Lauderdale, Florida. Agents observed the defendant's vehicle enter the parking lot of an Arby's that was adjacent to the Wawa and thereafter travel to the Wawa parking lot where the defendant parked next to the UC. The defendant contacted the UC and told him that that she did not have the correct quantity and that someone would be arriving shortly with the correct quantity. The defendant then exited her vehicle and entered the UC's vehicle. While in the UC's vehicle, the defendant spoke with an individual on the phone and informed the individual of her location. Shortly thereafter a Chrysler sedan arrived and backed into the parking space next to the defendant's vehicle. The vehicle opened its trunk, and the defendant exited the UC's vehicle. The defendant was then observed retrieving items from the trunk of the vehicle and placing them in a plastic bag. The defendant returned to the UC's vehicle and provided him a bag that contained a cereal box and a yellow envelope, which contained crystal methamphetamine. The UC provided $4,200 to the defendant in exchange for the crystal methamphetamine. Following the narcotics transaction, agents followed the Chrysler back to the stash house and observed Bain exit the vehicle and enter the residence. DEA Laboratory results determined that the methamphetamine had a net weight of 613 grams with 96% purity.

<u>Electronic and Wire Interceptions of the Defendant's Phones</u>

8. On April 6, 2023, agents began intercepting the wire and electronic communications of a telephone number used by the defendant to communicate primarily with co-conspirators for a period of 30 days. During those interceptions, agents determined that the defendant used a second

5

telephone number to facilitate her crystal methamphetamine distribution as well. As such, on May 5, 2023, agents renewed the interception of the defendant's first phone for an additional 30 days and on May 6, 2023, initiated the interception of her second phone for a period of 30 days. During the period in which agents intercepted telephones used by the defendant, agents identified multiple co-conspirators who served sources of supply to the defendant as well as customers who would further distribute crystal methamphetamine.

Interceptions of co-defendant Jonathon McGoniagle and the Defendant

9. On April 7, 2023, co-defendant Jonathon McGoniagle sent a text message to the defendant that stated, "How much for 1/2lb per oz. 150?" The defendant responded, "Yes. Only for u only tonight." Later that day, the following call, in relevant portions, was intercepted between the defendant and the McGoniagle:

Defendant: You wanna do a whole 1250?

McGoniagle: No, not 1250, you've done 12.

Defendant: 1250. [Unintelligible] [Voices overlap]

McGoniagle Uh-uh. Will you really believe, I got 150 times 8, right?

Defendant: I must [Unintelligible] 'cause the whole is 20, I'd do a whole for 25 and then a half 1250.

McGoniagle: [Unintelligible] You can't give me a $50 babe for my birthday? I may have to owe you, I may [Unintelligible] a little bit short of cash on hand until I go to Miami's [Unintelligible].

Defendant: That's not a... you really think that's a problem? That's not a f*cking problem.

McGoniagle: No. I know I have... I know I have the 800 dollars cash on me right now. And now I got... I think I have some maybe money in... they shut down my, they shut down my Venmo. Oh no, my... yeah, not Venmo, the other one, this other account.

Defendant: Cash App?

10. An additional call was intercepted that day between the defendant and McGoniagle wherein McGoniagle provided directions to his location. The defendant responded that her "runner" will contact McGoniagle and she will send the "runner's" phone number to him. McGoniagle told the defendant that "I'll have nine hundred cash in hand for him." Later, the defendant sent a text message to McGoniagle that contained J.Williams' phone number and a message that stated, "he is outside."

11. During these text messages and phones calls, the defendant negotiated the price of crystal methamphetamine, specifically $1,200.00 in exchange for a half a pound of crystal methamphetamine. The defendant told McGoniagle that she would sell a half a pound of crystal methamphetamine for $1,250.00. The defendant and McGoniagle thereafter coordinated a location for the transaction and the defendant sent J.Williams to collect the money and delivery the crystal methamphetamine to McGoniagle.

<u>Interceptions of co-defendant Donald Szukala and the Defendant</u>

12. On April 10, 2023, the following call, in relevant portions, was intercepted between co-defendant Donald Szukala and the defendant:

Defendant: I understand. You can come pick up the half, you want to pick up the half? Or you want to pick up the whole thing?

Szukala: [Stutters] that's nothing, I haven't touched the bag, cause' I don't know what you want me to do. If you want me to just give you... [Voices Overlap]

Defendant: Oh, you didn't touch that?

Szukala: No, it's [Unintelligible] in the... in the cereal thing.

Defendant: Oh, oh you could bring it and just trade it out.

Szukala: Trade it out for... a full one okay [Voices Overlap].

7

>Defendant: The whole, and just bring the eight hundred. [Voices Overlap]
>
>Szukala: And then I'll give you...
>
>Defendant: Yeah.
>
>Szukala: Okay
>
>Defendant: And bring the eight hundred and [Unintelligible] whole.
>
>Szukala: Okay, yeah, sounds good.
>
>Defendant: I'm sorry about that again.

13. During this call and as a result of not providing the correct quantity the day prior, the defendant explained that Szukala could pick up either a half a pound of crystal methamphetamine or return the crystal methamphetamine he previously received for an entire pound of crystal methamphetamine. Szukala stated that he hadn't opened the crystal methamphetamine he purchased the day prior and would return it for an entire pound. Additionally, the defendant told Szukala to bring $800 for an additional half a pound of crystal methamphetamine. Later that day, the defendant and Szukala met at a Wendy's and conducted a crystal methamphetamine transaction.

<u>Interception of co-defendant David Shteinberg and the Defendant</u>

14. On April 14, 2023, the following call was intercepted, in relevant portions, between the defendant and co-defendant David Shteinberg:

>Shteinberg: Okay, no, it's three altogether, it's three altogether that I need now.
>
>Defendant: Okay, so you need three and then bring out the three hundred and something grams straight out?
>
>Shteinberg: And the three altogether which one of the three, would be the three.
>
>Defendant: Okay, so you need two?
>
>Shteinberg: Yes, but I need you to bring three so we can exchange.

15. During this call, Shteinberg explained to the defendant that he had one pound of crystal

8

methamphetamine, which he had previously purchased from her, and he needed to exchange it due to the quality of the crystal methamphetamine. Furthermore, he explained that he needed to purchase two additional pounds of crystal methamphetamine. Later in the call, the defendant stated, "I don't know, when I got the stuff I'll call you." Following this call, Shteinberg requested an additional pound of crystal methamphetamine from the defendant.

16. On April 18, 2023, toll analysis of the telephone used by Shteinberg showed that he made an outgoing call to the defendant at 1:24 p.m. and had an incoming call from the defendant at 1:27 p.m. At approximately 2:38 pm., agents conducting physical surveillance of the defendant observed her travel and meet co-defendant Victor Tukes at his residence. V.Williams later departed the area and returned to 2864 NW 6th Court while carrying a large bag.

17. Later that day, the defendant sent a text message, in part, to Shteinberg and stated, "If u bring 400 I'll just give u what u paid for and we call everything even." Shteinberg, in part, responded, "You saying if I pay you $400 you will give me all 4 Correct?" and "Make sure you select for me 4 good ones and you will get from me the 400." Shteinberg further stated, "6 o'clock at KFC?" At approximately 8:00 p.m., agents conducting physical surveillance of the defendant observed her meet with Shteinberg and conduct a four pound crystal methamphetamine transaction. The following day, Shteinberg sent a message to the defendant and, in part, stated, "The stuff that I got from you it's below average It's sellable but not for the prices you want to implement now. Big pieces are great, but not necessarily makes the product good It's got some smell and it burns to (sic) quickly."

### Interceptions of co-defendant Victor Leevon Tukes and the Defendant

18. On May 13, 2023, the following call was intercepted between co-defendant Victor Tukes and the defendant:

Defendant: I said I'm still sitting here with my peoples in, at granny house.

9

Tukes: I'm just saying-

Defendant: [interrupts][unintelligible]

Tukes: cau[se], he, he waiting

Defendant: We been talking. Okay.

Tukes: Hello?

Defendant: Yes?

Tukes: Damn, how many, how many you think you gonna be? So, I can tell him.

Defendant: Um.

Tukes: I wish I'd a hauled a** out of there [unintelligible]

Defendant: I re, I rea, I really wanna just try his sh*t. Honestly. Then if my peoples like it then I grab, grab, but. So, one?

Tukes: [talking at same time] know it goin' be right.

Defendant: [talking at same time] Want me to just grab one?

Tukes: [unintelligible]

Defendant: I don't know, I don't know that.

Tukes: Shhh, you know-

Defendant: [interrupts] I don't know that.

Tukes: Yes you, you could look up.

Defendant: [unintelligible]

Tukes: It's up to you. You could look at it and, and b-, and then you feel me? If if you don't want it, he, you gonna get your money back. You don't want it you gonna get your money back. [unintelligible] there ain't no pressure there. Hello?

Defendant: Yes?

Tukes: Yeah you goin' get ya money back, If you don't like it. I promise you that. B*tch aint goin' play with me.

Defendant: [unintelligible]

10

Tukes: Long as that shi-, long as that product, it nothing aint missing, nothing, it's same thing, I'm gonna get my money back.

Defendant: Okay. I'll do um, I'm a do two then.

Tukes: Alright man. D*mn I shouldn't went in that sh*t man.

Defendant: I'm a call you back. I'm talking.

Tukes: Hey!

Defendant: Yes?

Tukes: So what you want me to pull up or what? Cause he waitin' on me.

Defendant: Um, yeah. Give me a minu-, yeah [unintelligible].

Tukes: Alright I'm coming now.

19. During this phone call, Tukes asked the defendant about the quantity of crystal methamphetamine that she wanted to purchase. The defendant explained that she preferred to see the crystal methamphetamine before purchasing it so that she could determine the quality of the crystal methamphetamine. Tukes assured the defendant that his source of supply would return her money if she did not like the quality. The defendant then agreed to purchase two pounds of crystal methamphetamine.

20. Following this phone call and later that evening, agents conducting physical surveillance observed Tukes arrive at 2864 NW 6th Court, Fort Lauderdale, Florida in a Lexus sedan and enter the residence. Thereafter and on this same day, the defendant was intercepted on multiple phone calls and text messages coordinating crystal methamphetamine transactions. Specifically, during an intercepted phone call with co-defendant Larramy Wood, he stated, "You said you were getting two pounds." The defendant contacted co-defendant Donald Szukala who stated, "Are you saying you have some?" The defendant replied, "Yes." Lastly, the defendant sent a text message to co-defendant Jonathan McGongiale and stated, "I have some work I can owe u what I can and if you wanna grab some also."

Additional and Total Interceptions of the Defendant

21. In addition to the above described interceptions, the defendant was also intercepted arranging crystal methamphetamine transactions with co-defendants Larramy William Wood, Harry Edward Hunter, Brandon Michael Hare, Allan Franklin Dunn, Luke Matthew Reeder, and Carson Derek Williams. These transaction involved the defendant supplying the co-defendants with crystal methamphetamine for further distribution.

22. During the interception period of the defendant's telephones, agents intercepted approximately six thousand pertinent calls and text messages between the defendant and co-defendants.

23. All events occurred in the Southern District of Florida.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

6/21/24
DATE

By: _____
BRIAN D. RALSTON
ASSISTANT UNITED STATES ATTORNEY

6/20/24
DATE

By: _____
JEFFREY H. GARLAND
COUNSEL FOR DEFENDANT

6/20/24
DATE

By: _____
VICTORIA YVONNE WILLIAMS
DEFENDANT